UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


JAMES E. STONE, SR.

VERSUS

PARISH OF EAST BATON ROUGE,
THROUGH RECREATION AND
PARK COMMISSION FOR THE
PARISH OF EAST BATON ROUGE

CIVIL ACTION

NO.06-401-FJP-SCR


**RULING**

This matter is before the Court on defendant Recreation and Park Commission for the Parish of East Baton Rouge's (hereinafter "BREC" or "defendant") motion for summary judgment.[1]  Plaintiff James E. Stone, Sr. ("Stone" or "plaintiff") filed an opposition to this motion.[2]  For the reasons which follow, defendant's motion for summary judgment is granted and plaintiff's suit is dismissed with prejudice.

I.    **Factual Background**

Plaintiff James Stone began his employment with BREC as an Assistant Supervisor in November of 2001 at the Webb Park golf complex.  Prior to this employment, Stone had been employed as the

---

[1]Rec. Doc. No. 40.

[2]Rec. Doc. No. 45.

CEO of SSMD Enterprises, LLC, a company which managed a public golf course in Kent, Washington.  In March of 2004, Stone's immediate supervisor Greta Myles, the Manager IV at Webb Park, was transferred to Howell Park golf course.  Approximately one week later, Stone sent a letter to Jack Terry, the Golf Manager for BREC at the time, and Patti Hough, BREC Human Resources Manager, wherein he claimed that he was performing the duties of a Manager IV and requested to be placed in the Manager IV position or receive comparable compensation until the position was filled at Webb Park.

On June 24, 2004, Stone was interviewed for the Manager IV position at Webb Park.  This position also included the responsibility of supervising the City Park Golf Complex.  Stone was interviewed by Stephanie Trim in Human Resources and Carl Johnson, Assistant Director of the Golf Department.  After approval by Carl Johnson and Ken Caldwell, BREC's Director of Golf, Stone was awarded the promotion of Manager IV at Webb Park.  This position was supervisory, and Stone's duties included among others the following: recruiting and training staff; implementing policies and procedures; overseeing all golf services and operations; developing innovative programs, including tournaments and golfer developments; and assisting in marketing, promotion, and budgeting.[3]

---

[3]*See* BREC Functional Job Description, Exhibit B to Rec. Doc. No. 45.

A short time following Stone's promotion to the Manager IV position, the defendant states that "Stone's prior experience and ability to manage multiple golf course complexes were called into question."[4]  Two long-time employees, Scott Leathers (an African-American male) and Alex Bookter (also an African-American male), requested transfers almost immediately following Stone's promotion. In Stephanie Trim's investigation of Stone's later discrimination complaints, she learned that Leathers requested a transfer because he alleged Stone did not follow BREC financial procedures and policy.[5]  Alex Bookter, who was Stone's assistant manager, requested a transfer to specifically "get away from Mr. Stone."[6] Bookter claimed Stone's supervisory and management skills were poor and testified that nearly everyone working around Stone had problems with him.

Stone's work history also reflects that in October of 2004, Stone acted without authority and in direct contravention of his job description by delegating his supervisory duties to a part-time clerk to supervise all starters and marshals at Webb Park.[7]  The record reflects that Carl Johnson verbally counseled Stone

---

[4]Rec. Doc. No. 41, p. 3.

[5]See Deposition of J. Stone, Exhibit No. 9, Rec. Doc. No. 41.

[6]Rec. Doc. No. 41, citing p. 4, Affidavit of Alex Bookter, Exhibit K.

[7]Deposition of Carl Johnson, pp. 55-56, Rec. Doc. No. 41, Exhibit D.

concerning his delegation of training and supervision to part-time staff.[8]

Despite these warnings, in November of 2004, Stone copied Carl Johnson on a memorandum which set forth that a part-time clerk would be assigned the responsibility of entering rounds into the handicapping system.[9]   In January of 2005, Stone copied Carl Johnson on a memorandum wherein another employee was delegated training and handicapping responsibilities.[10]

The record also reveals that on January 21, 2005, Carl Johnson advised Stone by correspondence that management was documenting Stone's instances of mismanagement with specific attention paid to the use of part-time staff to supervise and train employees. Johnson also indicated that Stone was "unable to effectively work with and manage his subordinates."[11]   Johnson warned Stone in this correspondence that if improvement was not seen within fourteen (14) days, Johnson would begin to transfer both full-time and part-time employees at Webb Park, including Stone, to other facilities throughout the BREC system.[12]

---

[8]*Id.* at pp. 56-57.

[9]November 12, 2004 Memorandum from J. Stone; Deposition of S. Trim, Exhibit 1 "M".

[10]January 19, 2005 memorandum from Jim Stone; Deposition of S. Trim, Exhibit 1 "M".

[11]Rec. Doc. No. 41, p. 5 (See January 21, 2005, memorandum from Carl Johnson to Stone).

[12]*Id.*

The defendant alleges Stone's work performance did not improve, and that over the months following the warning from Carl Johnson, several additional problems were discovered and many complaints regarding Stone were received.  Matthew Landry, a clerk who had worked under Stone, reported to Carl Johnson that during an argument with other former employees, Landry observed Stone state "they better calm down if they know what's good for them.  I keep a pistol in my car."[13]  Landry also advised BREC officials that he observed Stone leave the Webb pro shop one day with several bottles of soft drinks, which came from merchandise sold in the pro shop. Landry alleges that when he asked Stone if he was going to pay for the drinks, Stone responded: "No, if inventory is wrong that's Tracy's problem not mine," and then he left the Park without paying for the soft drinks.[14]  Landry also claimed that Stone referred to subordinates in an offensive manner and used expletives when describing their capabilities.[15]  Landry ultimately stated: "In my previous work experience _I have never seen someone in a management position behave in the unprofessional way_ Jim Stone has behaved since I have been at Webb."[16]

---

[13]*Id.* at p. 5, quoting April 8, 2005 memorandum from Matthew Landry to Carl Johnson.

[14]*Id.*

[15]*Id.*

[16]*Id.* at pp. 5-6 (emphasis in original).

In April of 2005, Carl Johnson visited Webb Park and discovered that Stone had delegated computer and cash register responsibilities to part-time clerks Michael Adams and Matthew Landry.  On very next day, Johnson created an incident report citing Stone with "improper management practices" and failing to follow prior instructions.[17]  This report placed Stone on three months' probation.[18]  Around April 14, 2005, Johnson received another complaint from a Webb employee and Stone subordinate John Crowder.  Crowder complained that while he worked under Stone's management, he had witnessed "various incidences of mismanagement," including improper daily procedures, misuse of employee labor time, and irresponsible management.[19]

Based on these issues, Stone was temporarily transferred to Beaver Creek around April 15, 2005, for the purpose of observing BREC's best management practices.[20]  The defendant claims that at the time Stone was transferred, he never complained or even suggested that any of the actions taken by BREC were racially motivated.

Defendant contends Stone's transfer to Beaver Creek did not improve Stone's work performance; in fact, BREC alleges plaintiff's

---

[17]*See* Incident Report, Exhibit 21 to Deposition of J. Stone.

[18]*Id.*

[19]*See* April 14, 2005 Memorandum from John Crowder, Exhibit 2 to Deposition of S. Trim.

[20]*See* Deposition of Carl Johnson, p. 61, lines 8-22.

work performance got worse.  On May 7, 2005, Stone was issued a written warning by Carl Johnson and Ken Caldwell regarding an instance when Stone brought his wife to work for an eight hour shift and escorted her around the golf course and had lunch with her in the club restaurant while Stone was on the clock.[21]  Stone refused to sign this warning.[22]

On May 11, 2005, while still on probation, Stone was issued another warning citing "carelessness" and "substandard work" for failing to lock the Beaver Creek Pro Shop when he left for the day.  As a Manager IV and being last person to leave the premises, Stone had the responsibility of securing the facility.  Haze Brignac, the Manager IV at Beaver Creek, had also expressed similar concerns regarding Stone's performance.[23]

On May 22, 2005, Stone sent a two page letter to Patty Huff, BREC's Human Resources Manager, complaining of a "highly explosive" situation between himself and a female pro shop clerk at Beaver Creek.  Stone alleged that this clerk had cursed him and behaved disrespectfully toward him.[24]  On June 4, 2005, Stone was transferred to Howell Park, and Stone testified in his deposition that he believed this transfer was to protect him from what he

---

[21]*See* Deposition of Ken Caldwell, pp. 69-71.

[22]Deposition of J. Stone.

[23]Deposition of Carl Johnson.

[24]*Id.*

perceived as threats by the Beaver Creek pro shop clerk.[25]

The defendant contends Stone's poor performance continued at Howell Park.  Specifically, on June 16, 2005, Carl Johnson documented a time when he observed Cynthia Johnson, a Howell Park pro shop clerk, working alone and unsupervised.  When questioned, Cynthia Johnson explained that Stone had called to give her instructions and told her he (Stone) was working from home.[26] Further discussions with Cynthia Johnson revealed that Stone never arrived at work before 9:00 a.m., and on the day in question, Carl Johnson called Cynthia Johnson at 11:41 a.m. and Stone still had not arrived at work.[27]  Similar instances were documented by the defendant on June 17, 18, 20, and 22 of 2005.  Carl Johnson issued yet another written warning to Stone on June 23, 2005, citing him for "improper conduct" and "absence from work without permission." The report also documents that Stone failed to notify his supervisor that he would not be at work on regularly scheduled shifts.[28]

On June 28, 2005, Cynthia Johnson who is an African-American female clerk, complained that Stone was harassing her.  BREC's investigation of that matter revealed that Stone had asked Cynthia

---

[25]Deposition of J. Stone, p. 137.

[26]Deposition of Carl Johnson, pp. 193-96.

[27]*Id.*

[28]Deposition of J. Stone.

Johnson to sign a document stating he was at work when in fact he was not at work.  In her deposition, Cynthia Johnson testified that Stone twice asked her to falsify documents.[29]

The defendant contends that Stone was terminated by Carl Johnson and Ken Caldwell on June 30, 2005, based solely upon his numerous documented acts of mismanagement.[30]

On May 9, 2005, several weeks following Stone's temporary transfer to Beaver Creek, he sent correspondence to various BREC board members and executives claiming he believed he was being subjected to race discrimination.  The defendant contends this letter represents the first notice given to BREC by Stone of any perceived discrimination.  In response to this complaint, BREC Human Resources Manager Patty Hough met with Stone to discuss the allegations, and Stone also later met with BREC Superintendent Mark Thornton.  Stephanie Trim, also an employee in Human Resources, testified that when Thornton questioned Stone about his allegations, Stone admitted that he did not believe he was being discriminated against because of his race, but that Carl Johnson was a bad manager and did not like him (Stone).[31]  Although Stone denied discrimination in these meetings, Stephanie Trim conducted

---

[29]Deposition of Carl Johnson, pp. 196-97; Deposition of Cynthia Johnson, pp. 24-29.

[30]Deposition of Ken Caldwell, pp. 46-48; Deposition of Carl Johnson, p. 219.

[31]Deposition of Stephanie Trim, pp. 68-69; 97-98.

a full investigation into the initial allegations by Stone.[32]  Trim interviewed the following BREC employees about Stone's allegations: Alex Bookter, Scott Leathers, and Greta Myles, all of whom are African-Americans and all of whom categorically refuted Stone's allegations of discrimination and in addition offered information indicating Stone's poor management skills.[33]

On May 31, 2005, at the conclusion of Trim's investigation, another meeting was held with Stone, Trim, and Thornton.  The defendant contends that at this meeting, Stone appeared satisfied with BREC's action.  In fact, Stephanie Trim testified that "Mr. Thornton asked in following up with him (Stone) how things were going, and he liked where he was at and things were going okay."[34]

On July 14, 2005, Stone submitted a written appeal to Thornton challenging his June termination, and an *ad hoc* committee met to hear his appeal on July 22, 2005.  The committee concluded, and Superintendent Thornton so communicated to Stone in a letter dated July 25, 2005, that the committee had reviewed the facts of Stone's work record, deliberated on the issue, and concluded that his

---

[32]*Id.* at pp. 98-99.

[33]*See* Deposition of Stephanie Trim, pp. 100-101.(Greta stated that Stone was not a good person to work with and that he delegated his duties (101, lines 4-14)); (Bookter and Leathers indicated that they had problems working with Stone; felt that Stone violated BREC policies and procedures, including those pertaining to financial controls (p. 102, lines 9-17; pp. 107-09)).

[34]*Id.* at p. 111, lines 7-10.

termination should be upheld.  Thornton also notified Stone of his right to a formal appeal.  A formal appeal hearing was subsequently held at BREC's offices on October 14, 2005, where a three person panel of the Human Resources Complaint Resolution Committee heard testimony of various individuals, and Stone was also allowed the right to present evidence through documents and testimony.  This hearing concluded after approximately two and a half hours.  On October 17, 2005, the Committee found that there was no clear or compelling evidence to support Stone's charges that he was wrongfully terminated or suffered discrimination by BREC and found that Stone's termination was justified and upheld.

Before the Human Resources Complaint Resolution Committee had rendered its ruling, Stone filed a charge of discrimination with the EEOC.[35]  On March 22, 2006, the Louisiana Commission on Human Rights determined that it could not conclude that the discrimination statutes were violated in Stone's case, and on April 4, 2006, the EEOC adopted these findings and issued such a determination to Stone.  Thereafter, Stone filed this action against BREC on June 9, 2006, asserting claims of race discrimination, harassment based on race, and retaliation in violation of Title VII of the Civil Rights Act of 1964,[36] along with

---

[35]Deposition of J. Stone.

[36]42 U.S.C. § 2000(e), *et seq.*

a claim under 42 U.S.C. § 1981[37] and intentional infliction of emotional distress under Louisiana tort law. Stone claims that for the duration of his employment as Golf Manager IV, he was subjected to race-based harassment, race discrimination and unlawful retaliation. Stone contends that it was shortly after his promotion to Manager IV that he began receiving racially disparaging remarks and comments by the supervisor who ultimately terminated him.

Specifically, Stone alleges that BREC's Assistant Director of Golf, Carl Johnson, repeatedly made race-based offensive remarks by referring to Stone as "Bubba" on several occasions, and also by using the distinction "you" or "your" people when referring to other African-Americans. Stone further alleges that as a result of his numerous complaints about BREC's conduct and practices, the defendant began "a fishing expedition in search of reasons to discipline and ultimately terminate" him.[38]

Stone contends he has had only success in his career prior to his employment with BREC. Stone also contends he had never been

---

[37]The Court notes that claims of racial discrimination in employment, pursuant to 42 U.S.C. § 1981 and Louisiana Employment Discrimination law, are governed by the same analysis as that employed for such claims under Title VII. *DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007)(citing *Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1284 n. 7 (5th Cir. 1994)(§ 1981); *Motton v. Lockheed Martin Corp.*, 2003-0962 (La. App. 4 Cir. 3/2/05), 900 So.2d 901, 909, *writ denied*, 904 So.2d 704 (2005)).

[38]Rec. Doc. No. 45.

demoted or terminated in his fifty years of prior work history. Stone states that he has years of personal experience as a golf instructor and member of private golf clubs, years of on-the-job training in golf operations and management including nine years as the Assistant Vice President of Fir State Golf Club in Seattle and seven years as Director of Operations and CEO of SSMD Enterprises, LLC.  Finally, Stone notes that after relocating from Washington and accepting a position as assistant supervisor at BREC's Webb Park, he received excellent performance ratings while in this position.

The Court now turns to a discussion of the law and analysis of plaintiff's claims.


## II.  Law and Analysis

### A.    Summary Judgment Standard

Summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[39]  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to

---

[39]Fed. R. Civ. P. 56(c);  *New York Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir. 1996);  *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 758 (5th Cir. 1996).

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[40]   A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[41]   If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."[42]

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial.[43]   The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence.[44]   Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory

---

[40]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  See also *Gunaca v. Texas*, 65 F.3d 467, 469 (5th Cir. 1995).

[41]*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting *Celotex*, 477 U.S. at 323-25, 106 S.Ct. at 2552).

[42]*Id.* at 1075.

[43]*Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996).

[44]*Little*, 37 F.3d at 1075;  *Wallace*, 80 F.3d at 1047.

facts."[45]  The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[46]  Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial.[47]

In order to determine whether or not summary judgment should be granted, an examination of the substantive law is essential. Substantive law will identify which facts are material in that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[48]  The Court now turns to a discussion of each of plaintiff's claims.

**B.   Race Discrimination**

A plaintiff may prove employment discrimination through either direct or circumstantial evidence.[49]  Direct evidence proves intentional discrimination without inference or presumption when

---

[45]*Wallace*, 80 F.3d at 1048 (quoting *Little*, 37 F.3d at 1075).  *See also S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 494 (5th Cir. 1996).

[46]*McCallum Highlands v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as revised on denial of rehearing*, 70 F.3d 26 (5th Cir. 1995).

[47]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

[48]*Id.* at 248, 106 S.Ct. at 2510.

[49]*Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).

believed by the trier of fact.[50]   Direct evidence includes "any statement or written document showing a discriminatory motive on its face."[51]   If the plaintiff proves direct evidence of discrimination, then the burden shifts to the employer to prove that the same adverse action would have occurred regardless of the discriminatory animus.[52]

Without direct evidence of discrimination, a plaintiff must establish the following elements of a *prima facie* case of discrimination under the *McDonnell Douglas* framework: (1) he is a member of a protected group, in this case African-American; (2) he was qualified for his position; (3) he was discharged or suffered some adverse employment action; and (4) he was replaced with a person outside of the protected class, or he was treated less favorably than similarly situated employees of a different race.[53] Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to assert a non-discriminatory, legitimate reason for the termination.[54]  Under the "modified *McDonnell Douglas*

---

[50]*Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002).

[51]*Fierros v. Tex. Dept. of Health*, 274 F.3d 187, 195 (5th Cir. 2001)(citing *Portis v. First National Bank of New Albany, Miss.*, 34 F.3d 325, 328 (5th Cir. 1994).

[52]*Laxton*, 333 F.3d at 578.

[53]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Okoye v. University of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001).

[54]*Id.* at 802, 93 S.Ct. 1817.

approach" employed by the Fifth Circuit, if the defendant meets this burden, the burden shifts back to the plaintiff to show: "(1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic. (mixed-motive[s] alternative)."[55]  The question of pretext versus mixed-motive treatment is only reached after a plaintiff has met his *prima facie* showing under the modified *McDonnell Douglas* standard and the defendant has responded with a legitimate nondiscriminatory reason.[56]  If a plaintiff then demonstrates that the protected characteristic was a motivating factor in the employment decision, "'it then falls to the defendant to prove that the same adverse employment decision would have been made regardless of discriminatory animus.  If the employer fails to carry this burden, plaintiff prevails.'"[57]

### 1.    Direct Evidence of Discrimination

Plaintiff contends he has provided direct evidence of discriminatory remarks made by his immediate supervisors as required under Title VII.    Workplace remarks are sufficient

---

[55]*Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005), citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).

[56]*Id.*, citing *Rachid*, 376 F.3d at 312.

[57]*Id.*, quoting *Rachid* 376 F.3d at 311-12.

evidence of discrimination if they are: "(1) related to the protected class of persons of which the plaintiff is a member, (2) proximate in time to the complained-of adverse employment decision, (3) made by an individual with authority over the employment decision at issue, and (4) related to the employment decision at issue."[58]  The Court finds that plaintiff fails to satisfy the first and fourth elements of this test.

Plaintiff claims he has presented direct evidence of race discrimination by alleging that his supervisor Carl Johnson often referred to him as "Bubba" and used the term "you people" or "your people" when talking to plaintiff.  Plaintiff contends these terms are race-based and testified in his deposition that in his opinion, "Bubba is a big, black, dumb stupid type boy."[59]  Further, plaintiff contends that because there is insufficient evidence to conclude that these statements are not related to race, there is a material issue of fact in dispute and summary judgment is improper.

The defendant argues these remarks do not constitute race discrimination because the terms used do not relate to race and there is no suggestion by plaintiff that the terms were stated in a context suggesting racial overtones.  Defendant also contends no evidence has been presented to show that the terms were used near

---

[58]*Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 401 (5th Cir. 2000)(citing *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996)).

[59]*See* Deposition of J. Stone, p. 173.

or at the time of plaintiff's transfer or his ultimate termination.[60]

The Court finds that the alleged remarks under the facts of this case do not constitute direct evidence of race discrimination. There is nothing directly or indirectly race-based about the words, "Bubba" or "you people" or "your people."  Furthermore, there is no evidence to establish that the statements were made at or near the time the ultimate employment decision was made or in conjunction with any employment decision whatsoever.  In addition, the Court finds the alleged statements are completely unrelated to the discipline received by plaintiff.  Accordingly, plaintiff must proceed with his case under the *McDonnell Douglas* framework since this case is not one involving direct evidence of race discrimination.

## 2. *Prima Facie* Case of Race Discrimination

Since the Court has found that this case involves circumstantial evidence of discrimination, the plaintiff must engage in the *McDonnell Douglas* burden shifting analysis set forth above.  The Court finds that plaintiff has failed to set forth a *prima facie* case of race discrimination by failing to establish

---

[60]*See* BREC's Memorandum in Support of Motion for Summary Judgment, Rec. Doc. No. 41, p. 21, n. 20: "Stone asserts that Carl Johnson stated 'you people' at the October appeal hearing. Johnson and those present (with the exception of Stone) deny that these comments were made.  Nevertheless, statements made 4-5 months after Plaintiff's termination are not relevant to these proceedings."

element (4), that he was replaced with someone outside of his protected class or that similarly situated employees of a different race were treated more favorably.

The record clearly establishes that plaintiff was replaced by an African-American female, Greta Myles, at the time he was terminated.[61] The law is well-settled that in a disparate treatment case involving separate incidents of misconduct, "for employees to be similarly situated those employees' circumstances, including their misconduct, must have been 'nearly identical.'"[62] Plaintiff has failed to create any material issues of fact with his allegations that similarly situated employees outside of his race were treated more favorably in "nearly identical" circumstances.

Plaintiff claims that Haze Brignac, a white manager, and Stacy Babin, a white assistant manager, were both treated more favorably for engaging in allegedly similar workplace conduct as plaintiff. Plaintiff contends Haze Brignac gave a private golf lesson while on the clock and was merely written up for inaccurate time sheet keeping. Plaintiff also contends that while he was disciplined for allegedly allowing part-time clerks to use the computer, which does not state the full nature and terms of discipline plaintiff

---

[61]*See* Deposition of Carl Johnson, p. 139, line 25, p. 140, lines 1-18, Exhibit D to Rec. Doc. No. 41.

[62]*Perez v. Texas Dept. of Criminal Justice, Institutional Division*, 395 F.3d 206, 213 (5th Cir. 2004)(citing *Little v. Republic Ref. Co., Ltd,* 924 F.2d 93, 97 (5th Cir. 1991)(see also, *Smith v. Wal-Mart Stores*, 891 F.2d 1177, 1180 (5th Cir. 1990)).

received, Tracy Babin was allowed to have a clerk assemble a
computer and complete tournament sheets and score cards on the
computer.

Defendant argues there is no evidence that other management
employees, black or white, engaged in the type or number of
employment infractions as plaintiff. Defendant contends and the
Court agrees that such a comparison is impossible to make.
Defendant states:

> There is no evidence that other managers
> failed to secure pro shop facilities at the
> close of business. There is no evidence that
> anyone has ever asked a subordinate to sign a
> false document or statement. There is no
> evidence that any other employee has ever
> sought to work at and supervise subordinate
> employees from home. There is no evidence
> that managers have ever escaped or received
> less discipline for habitual tardiness,
> unexcused absences, theft of merchandise, and
> a general inability to perform the basic
> functions of a manager.[63]

The Court finds that the record is replete with evidence that
the plaintiff did in fact engage in the conduct for which he was
disciplined. Any attempts to compare plaintiff's conduct to Haze
Brignac and Tracy Babin is impossible because Brignac and Babin
engaged in one comparable violation rather than committing the
plethora of violations for which plaintiff was disciplined and
ultimately terminated. Thus, the Court would be comparing "apples

---

[63]BREC's Memorandum in Support of Motion for Summary
Judgment, Rec. Doc. No. 41, p. 18.

and oranges" to equate the entirety of plaintiff's work performance with one violation committed by Brignac or Babin which was similar to one of the violations committed by plaintiff.  Thus, the Court finds that plaintiff has failed to establish the fourth element of his *prima facie* case.

However, out of an abundance of caution and in the alternative, the Court will proceed with the burden-shifting analysis, assuming *arguendo* that plaintiff had established a *prima facie* case of race discrimination.  The burden is placed upon the defendant to show a legitimate non-discriminatory reason for its employment decision.  The legitimate, non-discriminatory reasons for plaintiff's discipline and termination have been set forth extensively above.  Many of the complaints which resulted in plaintiff being disciplined came from African American employees.  Thus, the burden shifts back to the plaintiff to show pretext for the alleged non-discriminatory reasons or that his race was a motivating factor in the termination.

### 3.   Rebutting the Legitimate Nondiscriminatory Reason for Termination

Even if the Court assumes the plaintiff set forth a *prima facie* case for race discrimination under *McDonnell Douglas*,[64] the record clearly shows that the defendant has provided sufficient summary judgment type evidence of a legitimate, non-discriminatory

---

[64]*McDonnell Douglas Corp. v. Green*, *supra*.

reason for plaintiff's termination.

The defendant has established that the plaintiff had several work performance deficiencies which constitute legitimate non-discriminatory reasons for the plaintiff's termination. Thus, the plaintiff must present evidence that the reasons given by the defendant for plaintiff's termination are a pretext for race discrimination or that his race was a motivating factor in the termination. The Court finds that plaintiff has failed to present any summary judgment type evidence of pretext or racial motivation on the part of the defendant, nor has plaintiff presented sufficient evidence to create a material issue of fact in dispute which would require the Court to deny plaintiff's motion for summary judgment.

First, none of plaintiff's arguments or evidence overcome his clearly poor work performance during the time period leading up to his termination. Plaintiff concedes he received the disciplinary action taken by the defendant, but he claims that others have committed similar acts without receiving the same punishment which he received. By focusing on only those instances of misconduct which other employees might have also committed, he acknowledges that he did in fact commit the numerous violations found by the defendant. Furthermore, the law is clear that merely disputing one's work performance does not necessarily support an inference of

pretext.[65]   Also, the defendant does not have to prove that its decision to terminate the plaintiff was correct.   However, the defendant must establish that it was not racially motivated.   The Court must consider "whether the termination was done with discriminatory intent, not whether it was correct from a business, ethical, or personal perspective."[66]

Plaintiff's reliance upon testimony from other employees about alleged racial animus on the part of the defendant towards other employees and/or patrons is misplaced and totally irrelevant to the case at bar.   Defendant contends that Greta Myles' complaints regarding her difficulty in advancing with BREC are not similar to the violations committed by the plaintiff in this case.   Myles' complaints dealt with promotions, not discipline or termination for work performance problems.   In contrast, the plaintiff was promoted and his allegations focus on the disciplinary action taken against him following his promotion.   Thus, the claims of plaintiff and Greta Myles are unrelated and do not constitute sufficient evidence to overcome or dispute defendant's given reasons for plaintiff's

---

[65]See *Shackelford v. Deloitte & Touche, L.L.P.*, 190 F.3d 398 (5th Cir. 1999).

[66]*Morrison v. Weyerhaeuser Co.*, 119 Fed. Appx. 581, 585, 2004 WL 2830846 (5th Cir. Dec. 10, 2004)(citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002)("[An employer] is entitled to be unreasonable so long as it does not act with discriminatory animus"); see also *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995)).

termination.[67]

The Court now turns to a discussion of applicable case law which provides further support for the Court's holding in this case.

### 4.   Applicable Jurisprudence

The Fifth Circuit recently addressed a case similar to the one now pending before the Court in *Turner v. Baylor Richardson Medical Center*.[68]  In *Turner*, plaintiff was an African-American female hired by RHA, a governmental subunit of the State of Texas which operated a hospital, to be a secretary in 1999.  The Foundation was a non-profit corporation which coordinated fundraising activities on behalf of RHA and publicized RHA's services to the community.  Turner was primarily responsible for preparing weekly reports on fundraising activity which were then distributed to several Foundation officers.

From 2001 to 2002, Turner was supervised by Boring.  Although Turner's work reviews during this time period were generally positive and she received her merit-based raises and bonuses, Boring testified that some Foundation members complained about the

_____

[67]The parties dispute the application of the "same-actor" inference to this case.  The Court finds that whether or not it applied the inference in this case, this would not change the outcome.  Even without application of the inference, plaintiff has failed to meet his burden under the law.  Thus, it is not necessary for the Court to discuss this issue in detail in this opinion.

[68]476 F.3d 337 (5th Cir. 2007).

accuracy and timeliness of plaintiff's work.  During this time period, Turner was warned about improving her organizational skills, advised to cease excessive personal phone use, and learn to use Microsoft's Excel spreadsheet software.[69]

In January 2002, Mary Colston was hired to be Turner's supervisor.  Problems arose between Colston and Turner, and Turner was ultimately dismissed for repeatedly failing to complete her work in an accurate and timely manner, her chronic tardiness and failure to maintain a work schedule, engaging in excessive personal telephone and e-mail use during work hours, and insubordination to Colston.  Turner denied this description of her work performance and contended that her difficulties and discharge were a result of race discrimination.[70]

Turner alleged that Colston made a series of racially insensitive or derogatory remarks to her during the course of her employment.  Specifically, Turner alleged Colston referred to inner-city children as "ghetto children" on several occasions. When Turner mentioned to Colston that she was taking college courses, she claims Colston told her she had worked at a university where African-American students attended evening classes because they could not qualify for regular admission.  Turner also claimed Colston exhibited surprise or disdain when learning that Turner

---

[69]*Id.* at 342.

[70]*Id.*

shopped at an upscale shopping mall, drove a Volvo, and had a son that bought and sold cars as a hobby.  In spite of these things, Turner admitted that she complained to no one about Colston's alleged conduct.[71]

In March 2002, Colston advised Boring and RHA's Human Resources representative Connie Wright of her dissatisfaction with Turner's work.  Subsequently, Turner e-mailed Boring and Wright regarding Colston's treatment of her during an argument, but failed to mention race.  A meeting was held with Colston, Turner, and Wright wherein Turner was placed on administrative leave.  Five days later, Turner was terminated and her position was filled by a white female.[72]

Turner ultimately filed suit alleging race discrimination, hostile work environment, retaliation, and a violation of 42 U.S.C. § 1981.  Defendants moved for summary judgment and the district court ruled in favor of the defendant RHA.  On appeal, the Fifth Circuit recognized that Turner established a *prima facie* case of race discrimination.  However, the Court stated:

> RHA articulates a host of legitimate, nondiscriminatory reasons for her termination related to the quality and timeliness of her work, insubordination, chronic tardiness, and excessive personal telephone and email use during business hours.  Turner primarily relies upon her own declaration, which largely

---

[71] *Id.*

[72] *Id.*

> consists of conclusory assertions rebutting RHA's reasons, to establish pretext. Conclusory statements are not competent evidence to defeat summary judgment. *See Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). Instead, Turner must offer specific evidence refuting the factual allegations underlying RHA's reasons for her termination. *See Enplanar, Inc. v. Marsh*, 11 F.3d 1284 (5th Cir. 1994).[73]

Turner also attempted to establish pretext by arguing that RHA failed to follow its employee handbook when implementing disciplinary procedures against her. The court rejected this argument, stating: "'A defendant's failure to follow its own policy is not probative of discriminatory animus in absence of proof that the plaintiff was treated differently than other non-minority employees because Title VII does not protect employees from the arbitrary employment practices of their employer, only their discriminatory impact.'"[74] The court further held that Turner "has introduced no evidence suggesting that RHA adhered to its disciplinary policies differently in cases involving non-minority employees. Therefore, RHA's alleged failure to follow its policy does not serve to establish pretext."[75]

Similarly, this Court finds that BREC has articulated several legitimate, non-discriminatory reasons for Stone's termination.

---

[73] *Id.* at 345-46.

[74] *Id.* at 246, quoting *Upshaw v. Dallas Heart Group*, 961 F.Supp. 997, 1002 (N.D. Tex. 1997).

[75] *Id.*

The Court also finds that, like the plaintiff in *Turner*, Stone relies primarily on his own conclusion and/or assumption that the allegedly offensive terms used ("Bubba" and "your people") carry some racial overtone, which is insufficient to defeat a summary judgment motion.  The comments made in *Turner* were clearly race-based and arguably more offensive than those alleged by Stone. Finally, the Court finds that Stone has failed to offer specific summary judgment type evidence refuting the factual allegations which form the basis for BREC's decision to terminate plaintiff. As the Fifth Circuit held in *Turner*, the simple fact that BREC may or may not have adhered to its own discipline policy is not probative of discriminatory intent without some proof that the plaintiff was treated differently than non-minorities engaged in similar employment infractions.

### C.   Racial Harassment

The plaintiff also claims he was subjected to harassment by his supervisor based on his race.  In any Title VII racial harassment case, a plaintiff must establish the following: (1) he belongs to a protected class; (2) he was subjected to unwelcome harassment; (3)  the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment

and failed to take prompt remedial action.[76]

In *Meritor Savings Bank v. Vinson*, the United States Supreme Court held that in order for a plaintiff to establish actionable harassment, such conduct must be sufficiently severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment.[77] An employee need not suffer the loss of pay, benefits, or the job itself in order to have a claim for racial harassment.  The Supreme Court further held that in order to establish actionable harassment, the conduct must be both subjectively and objectively offensive.[78]  Specifically, plaintiff must prove that a reasonable person would have been offended by the conduct (objective element).  In addition, he must prove that he was actually offended by the conduct (subjective element).[79] Whether an environment is hostile or abusive is determined by looking at all of the circumstances, including the "frequency of the discriminatory conduct; whether it is physically threatening or

---

[76]*Harvill v. Westward Communications, L.L.C.*, 433 F. 3d 428, 434 (5th Cir. 2005), citing *Woods v. Delta Beverage Group, Inc.*, 274 F. 3d 295, 298 (5th Cir. 2001).

[77]477 U.S. 57, 67, 106 S. Ct. 2399, 2405, 91 L.Ed.2d 49 (1986).  In *Harvill v. Westward Communications, L.L.C.*, the Fifth Circuit Court of Appeals clarified though it may have previously cited the standard as "severe AND pervasive," the appropriate standard is "severe OR pervasive."  433 F. 3d 428, 434 (5th Cir. 2005).

[78]*Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S. Ct. 2275, 2283, 141 L.Ed.2d 662 (1998).

[79]*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22, 114 S. Ct. 367, 370, 126 L.Ed.2d 295 (1993).

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[80] Further, an employer is vicariously liable for a supervisor's racially harassing behavior where no tangible employment action is taken against the employee by the harassing supervisor.[81]

### 1.   Severe or Pervasive Conduct

The Court must determine whether the alleged facts, viewed in the light most favorable to Mr. Stone, constitute severe or pervasive racial harassment.   A careful review of the record reveals that Mr. Stone has not established the alleged harassment was so severe or pervasive that it affected a term, condition, or privilege of his employment.   Any holding to the contrary would conflict with settled jurisprudence and not be supported by the evidence in this case.   While plaintiff may have established that the comments were frequent during the time period at issue, he failed to show how such comments were humiliating or threatening or how such comments unreasonably interfered with his work

---

[80]*Id.* at 23.

[81]*Faragher*, 524 U.S. at 807, 118 S.Ct. 2275 (1998).   Where there is no tangible employment action, the employer may avoid liability by raising the two-pronged *Faragher/Ellerth* affirmative defense which requires: (1) that the employer exercised reasonable care to prevent and correct promptly any harassment, and (2) the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or avoid harm otherwise.   Because there is a tangible employment action in this case (Stone's termination), the *Faragher-Ellerth* defense is inapplicable.

performance.

The Fifth Circuit Court of Appeals has declined to recognize conduct arguably more egregious than that allegedly committed against Mr. Stone as actionable racial harassment in prior decisions.[82]   The Fifth Circuit's decision in *Turner v. Baylor Richardson Medical Center*, discussed previously herein, is also applicable on this point of law.  Turner had also brought a hostile work environment claim against RHA, claiming that her supervisor Colston's "ghetto children" comment, university night school comment, and comments related to Turner's shopping habits, car and son's hobby created a hostile work environment.  The court rejected this argument, holding that "[t]he 'ghetto children' comments, while perhaps racially inappropriate, ceased upon Turner's request. Colston's other comments were isolated incidents.  Further, these comments pale in comparison, both in severity and frequency, to those found in the cases cited by Turner."[83]

---

[82]*See* e.g., *Mosley v. Marion County, Miss.*, 111 Fed. Appx. 726, 728 (5th Cir. 2004)(unpublished)(holding that evidence of three incidents involving racial slurs was insufficient to support a hostile work environment claim); *Pickens v. Shell Technology. Ventures,* Inc., 118 Fed. Appx. 842, 850 (5th Cir. 2004)(unpublished)(holding that a company Christmas party where a skit with characters in blackface was performed and racially insensitive comments were made to plaintiff did not create a hostile work environment).

[83]*Turner*, 476 F.3d at 348. (See *Walker v. Thompson*, 214 F.3d 615, 619-22 (5th Cir. 2000) (abrogated on other grounds) (holding that plaintiff survives summary judgment where evidence demonstrated years of inflammatory racial epithets, including "nigger" and "little black monkey"); *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1266 (7th Cir. 1991)(finding summary

The analysis by a judge in the Eastern District of Texas in *McCray v. DPC Industries, Inc.* is also relevant to the issue before the Court.[84]  McCray, an African-American male, had been hired in May of 1991 at DPC Industries' Longview, Texas facility and was terminated in July of 1992.  Terry Lee Pierce was McCray's foreman during his employment.  Pierce reported to Charles Harding, the facility operations manager.

McCray alleged that shortly after his employment began, he was subjected to racial slurs, remarks and jokes.  He alleged that on one occasion, a truck driver called him a "God damned nigger," and that Pierce twice told a Rodney King joke in his presence.  In August 1991, McCray complained to Harding about the racial slurs.  Harding called a meeting of all Longview employees advising that racial jokes, epithets, and comments were improper and the employees were not to engage in such conduct, threatening suspension for those who did so.  Following this meeting, McCray never reported another racial slur or joke.[85]

While McCray failed to report any other racial remarks or jokes to management, he alleged in his lawsuit that Pierce called

---

judgment for defendant inappropriate where plaintiff was subjected to "nigger jokes" for a ten-year period and whose workstation was adorned with "a human-sized dummy with a black head"); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 182 (4th Cir. 2001)(reversing summary judgment where plaintiff suffered "incessant racial slurs" including "nigger" and "dumb monkey").

[84]942 F.Supp. 288 (E.D. Tex. 1996).

[85]*Id.* at 290.

him "son" three of four times during the remainder of the year that McCray worked for DPC.  McCray also claimed that during that time frame, Pierce referred to him as "black yankee" and insulted Jesse Jackson, Malcolm X and Martin Luther King, Jr. four or five times. McCray testified that these insults were made in the context of political discussions during Jackson's presidential campaign.[86]

Subsequently, McCray mailed a letter to a DPC vice president complaining about various workplace issues regarding the distribution of overtime opportunities and alleged misconduct engaged in by his coworkers.  The letter also advised of Pierce's Rodney King joke and the truck drivers' racial remarks.  The vice president conducted an investigation based on this letter, instructed Longview employees that such conduct was not to be tolerated, but found no evidence that an employee had actually done what McCray claimed; thus, no disciplinary action was taken against anyone.[87]

During his meeting with the DPC vice president, McCray requested an opportunity to drive a forklift and to load and unload tank trucks.  Harding and Pierce advised the vice president that McCray had received the training for these tasks but had a poor safety and work record which made them reluctant to allow McCray to

---

[86] *Id.*

[87] *Id.* at 290-91.

perform such work.   The vice president instructed Pierce and Harding to give McCray the chance to perform such tasks, and McCray was assigned the work.[88]

The following consequences resulted from McCray's performance of these duties: he crashed the forklift into an overhead crane support creating a safety hazard and destroying property; sped across the loading dock in a forklift causing drums of flammable liquid to fall from the forklift and become damaged upon hitting the ground below the dock; improperly used the forklift to push a metal drum of flammable liquid across the cement dock causing sparks to fly; and improperly pumped flammable liquid into storage tank causing a risk of explosion or fire.   All of these instances were violations of DPC's rules of conduct as well as rules regarding performing job duties in a safe manner.[89]

Finally, when McCray confronted Pierce about the accuracy of his time card, the men argued and McCray called Pierce, his supervisor, a "liar."   Pierce poked McCray in the chest, to which McCray responded by punching Pierce in the face.   McCray was discharged three days later, and Pierce was also disciplined and ultimately discharged for his participation in the altercation.[90]

The district court found that summary judgment was appropriate

---

[88]*Id.* at 291.

[89]*Id.*

[90]*Id.*

in favor of DPC on McCray's hostile work environment claim.  With respect to the severe or pervasive requirement, the court noted that the law "requires a plaintiff to 'prove more than a few isolated incidents of racial enmity.'[91]  Instead, 'there must be a steady barrage of opprobrious racial comments.'[92]  The mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee does not affect the conditions of employment to a sufficiently significant degree to violate Title VII.[93]  Similarly, racial comments that are sporadic or part of casual conversation do not violate Title VII."[94]

The court held as a matter of law that the incidents on which McCray based his hostile work environment claim did not create such an environment.  The court found that the alleged actions, calling McCray "son," "black yankee," and insulting black political leaders on a few occasions, "while not commendable, are not so numerous and opprobrious as to constitute a hostile work environment."[95]

---

[91]*Id.* at 293, quoting *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412 (10th Cir. 1987).

[92]*Id.*, quoting *Bolden v. PRC, Inc.,* 43 F.3d 345, 551 (10th Cir. 1994).

[93]*Id.*

[94]*Id.*, citing *Hicks*, 833 F.2d at 1412; see also *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir. 1981); *Hampton v. Conso Prods., Inc.*, 808 F. Supp. 1227, 1236 (D.S.C. 1992); *Pierson v. Norcliff Thayer, Inc.*, 605 F.Supp. 273, 277 (E.D. Mo. 1985).

[95]*Id.*

Further, the court stated that "[t]he racial jokes and comments were sporadic and merely part of casual conversation, and '[r]acial comments that are merely part of casual conversation, are accidental, or are sporadic do not trigger Title VII's sanctions.'"[96]  The court also held that the fight between Pierce and McCray did not constitute a hostile work environment, finding no evidence that the fight "was predicated on racial animus, as opposed to personal animosity between these two men."[97]

The court held that DPC was entitled to summary judgment on the hostile work environment claim because DPC took prompt remedial action to eliminate the complained-of behavior by calling an employee meeting promptly after McCray's initial complaint and by DPC's vice president responding immediately to McCray's letter and allowing McCray to attempt the jobs requested.[98]

It is clear that the comments complained of in *McCray* were clearly race-based and far more offensive than those alleged in this case by Stone.  Further, the record in this case reflects that BREC immediately conducted an investigation into Stone's charges, and he received a full hearing and an appeal.  Plaintiff has simply failed to create a genuine issue of material fact that he established a *prima facie* case of race-based harassment.  Clearly,

---

[96]*Id.*, quoting *Johnson*, 646 F.2d at 1257.

[97]*Id.*

[98]*Id.* at 294.

the Fifth Circuit jurisprudence set forth above supports the Court's holding on this issue.

**D.   Retaliation**

A plaintiff may prove retaliation by establishing the following three elements: (1) he engaged in activity protected by Title VII; (2) he suffered an adverse employment action; and (3) a causal link existed between the protected activity and the adverse employment action.[99]  If the plaintiff establishes a *prima facie* case of retaliation, the defendant must show a non-retaliatory, legitimate reason for the adverse employment action.  If the defendant meets this burden, the plaintiff must then offer evidence to create a genuine issue of material fact that the defendant's reason is a pretext for discrimination.[100]

In his Complaint, Stone contends that after filing a written report of race discrimination on April 12, 2005, he was placed on three months probation.  He contends after his second complaint, he was transferred to Beaver Creek, and after his third complaint was submitted in May of 2005, he was terminated in June of 2005.  The defendant disputes these allegations and argues they are completely unsupported by the record, which reflects that plaintiff's first complaint of discrimination was the May 9, 2005, letter to Carl Johnson.  Defendant contends that by this time, plaintiff had

---

[99]*Fierros*, 274 F.3d at 191.

[100]*Keelan v. Majesco Software, Inc.*, *supra.*, n. 55.

already received numerous warnings of unsatisfactory performance and violations of BREC policy. The defendant contends, and the Court agrees, that the record of documents submitted prior to May 9, 2005, reveal that Stone never mentioned race as a factor in any decisions affecting him professionally. Thus, plaintiff's claim of retaliation could only be based upon his proving a causal connection between his June 30, 2005, termination and his May 9, 2005, complaint letter and subsequent investigation.

The Court finds, based on the severity and regularity of plaintiff's poor work performance and unprofessional employment conduct (missing work, attempting to falsify records and asking fellow employees to do so), there is no causal connection between plaintiff's termination and his complaint of race discrimination. The Court also finds that plaintiff has failed to present any summary judgment type evidence to establish that any of the proffered reasons for discipline against the plaintiff were pretextual. The record reflects that BREC's actions against Stone were well-documented and supported.

The *McCray* case discussed above is also applicable on the issue of retaliation. McCray claimed that after he wrote a letter to the company vice president opposing his alleged discriminatory treatment, he was given harder work assignments and was criticized for trivial matters.[101] The district court granted summary judgment

---

[101]*McCray,* 942 F.Supp. At 294.

and the Fifth Circuit affirmed summary judgment on McCray's retaliation claim for the following reasons:

> Even assuming, *arguendo*, that McCray established a *prima facie* case of retaliation, his claim still fails because he did not produce any evidence sufficient to show that DPC's stated reasons for its employment actions were a pretext for retaliation. DPC presented a legitimate, non-discriminatory and non-retaliatory reason for its employment decisions regarding McCray: his violations of safety and work rules, which posed a threat to both him and his co-workers. Although McCray had ample time to prepare his response, he presented no admissible evidence sufficient to create a genuine issue of material fact that this reason was a pretext for retaliation. Thus, DPC is entitled to summary judgment.[102]

Likewise, Stone has failed to present any evidence of pretext in the voluminous and well documented reasons given by the defendant for the plaintiff's termination. Therefore, the Court finds that summary judgment should be granted in favor of the defendant on this issue.

## III. Conclusion

The Court finds that the defendant's motion for summary judgment should be granted as a matter of law under the facts of this case.[103]

Therefore:

For the reasons set forth above, defendant's motion for

---

[102]*Id.* at 296.

[103]The Court has considered all of the contentions of the parties whether or not specifically discussed herein.

summary judgment is GRANTED, and plaintiff's federal claims are dismissed with prejudice.    The Court declines to exercise jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367.    Therefore, plaintiff's state law claims are dismissed without prejudice.

Judgment shall be entered accordingly.

Baton Rouge, Louisiana, September 30, 2008.

FRANK J. POLOZOLA
MIDDLE DISTRICT OF LOUISIANA